# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

CANTRELL MITCHELL,
DANTE DAVENPORT,
ADRIAN HESTER,
DAVID MCCARLEY,
ANTHONY PITTMAN,
ROBIN TIL and
MALCOLM WILSON,

                Plaintiffs,

    v.

PEPSICO; BOTTLING GROUP, LLC;
BOTTLING GROUP LLC dba PEPSI
BEVERAGES COMPANY; PEPSICO
BEVERAGE SALES, LLC, Individually, and
as a subsidiary of PEPSICO, INC.;
SUPERVISOR RYAN MELLER, Individually
and in his Official Capacity; SUPERVISOR
ZACH RUEGER, Individually and in his
Official Capacity; SUPERVISOR AARON
HELTZ, Individually and in his Official
Capacity; PAUL HUDSON, Individually and
in his Official Capacity; and Does 1 through
100,

                Defendant(s).

CIVIL ACTION NO.:

COMPLAINT FOR DAMAGES

1. TITLE VII VIOLATIONS, RACE
   DISCRIMINATION, HARASSMENT,
   RETALIATION & HOSTILE WORK
   ENVIRONMENT
2. 42 U.S.C. § 1981 VIOLATIONS
   RACIAL HARASSMENT,
   DISCRIMINATION & RETALIATION
3. N.Y.S. EXC. LAW § 296 VIOLATIONS-
   DISCRIMINATION,
   HARASSMENT & HOSTILE WORK
   ENVIRONMENT
4. N.Y.S. EXC. LAW § 296, VIOLATIONS-
   WRONGFUL TERMINATION
5. NEGLIGENT HIRING, TRAINING,
   RETENTION, AND SUPERVISION

JURY TRIAL DEMANDED

## I.INTRODUCTION

1.    PLAINTIFFS, by their attorneys, CHARLES A. BONNER of the LAW OFFICES OF

BONNER & BONNER, and JESSE RYDER of the RYDER LAW FIRM, as and for their

Complaint, respectfully allege, on behalf of themselves and others similarly situated, upon

information and belief, as follows:

2.      This is an action for legal and equitable relief to redress Defendants' unlawful discrimination and harassment based on race, and retaliation against the Plaintiffs. The suit is brought to seek damages for economic and non-economic damages; and a declaratory judgment that Defendants have engaged in a systemic pattern and practice of racial discrimination in employment opportunities and have engaged in a campaign of retaliation towards Plaintiffs for reporting racial discrimination.

3.      By engaging in unlawful employment practices and intentional racial discrimination, Defendants violated federal law in 42 U.S.C. Section 1981 providing: "(a) Statement of Equal Rights: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

4.      Plaintiffs' action is to redress the deprivation of rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended by the Civil Rights Act of 1991, 42U.S.C.§1981 (hereinafter "Title VII"); and 42U.S.C. §1981 (hereinafter "§1981") and N.Y.S. EXC Law §§ 296(1)(a)(e)(h) and 296(7), which provide for relief against discrimination and harassment in employment on the basis of race and retaliation related thereto.

5.      Specifically, Plaintiffs allege that DEFENDANTS have subjected African American employees to a hostile work environment based on their race, African American.  Plaintiffs allege that DEFENDANTS have retaliated against both European American employees and African American employees for objecting to, and reporting, an extreme hostile work

environment of racism and discrimination against Plaintiffs and African American employees based on their race.  DEFENDANTS have embarked on a pattern and practice of pervasive and severe hostile conduct in the work environment, depriving Plaintiffs of the terms, conditions and benefits of their employment including, promotion, discipline, and training. DEFENDANTS unlawfully retaliated against Plaintiffs for opposing DEFENDANTS' unlawful conduct and unlawful employment practices.

6.      Plaintiffs seek a permanent injunction and other equitable relief necessary to eliminate the effects of the DEFENDANTS' past and present racial discrimination and to prevent such discrimination from continuing to adversely affect their lives and careers. Plaintiffs request this Court to require DEFENDANTS to affirmatively restructure the work environment to eliminate all forms of discrimination and to create an equitable promotion selection procedure, including but not limited to, fairly providing training and other terms and conditions of employment. Each Plaintiff seeks damages, back-pay, front-pay; and A. Economic loss, including lost wages, lost benefits, pharmacy bills, medical bills, and other economic loss can be quantified when ascertained. B. Non-economic loss, including, but not limited to, pain, anxiety, inconvenience, mental distress, emotional distress, loss of enjoyment of life, humiliation, fear, discomfort, damage to health image, damage to career, suffering and misery.

7.      The Plaintiffs seek compensatory and punitive damages and request a jury trial pursuant to 42 U.S.C § 1981a. Further, the Plaintiffs seek attorneys' fees and costs pursuant to 42U.S.C.§1988; and other equitable remedies necessary to make them whole.

## II. JURISDICTION AND VENUE

8.    Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4), and 42 U.S.C. § 2000e-5; and 42 U.S.C. § 12117(a) and 12203, which incorporates by reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5(f)(1) and (3), Section 102 of the Civil Rights Act of 1991, as amended, 42 U.S.C. § 1981a and the "Civil Rights Act of 1866," as amended by § 101 of the "Civil Rights Act of 1991," and codified at 42 U.S.C. § 1981; N.Y. Exec Law §§ 296(1)(a)(e)(h) and 296(7); and N.Y. Exec. Law, art. 15 ("Human Rights Law").

9.    Venue is proper in this judicial district because the unlawful employment practices alleged herein below were committed by the DEFENDANTS within Onondaga County, State of New York. Venue is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5.

## III. PARTIES

10.    Plaintiff Cantrell Mitchell, is an African American male citizen of the United States over the age of nineteen (19) years and is a resident citizen of the State of New York.

11.     Plaintiff Dante Davenport, is an African American male citizen of the United States over the age of nineteen (19) years and is a resident citizen of the State of New York.

12.    Plaintiff Adrian Hester, is an African American male citizen of the United States over the age of nineteen (19) years and is a resident citizen of the State of New York.

13.    Plaintiff David McCarley, is an African American male citizen of the United States over the age of nineteen (19) years and is a resident citizen of the State of New York.

14.    Plaintiff Anthony Pittman, is an African American male citizen of the United States over the age of nineteen (19) years and is a resident citizen of the State of New York.

15.    Plaintiff Robin Til, is an African American male citizen of the United States over the age of nineteen (19) years and is a resident citizen of the State of New York.

16.   Plaintiff Malcolm Wilson, is an African American male citizen of the United States over the age of nineteen (19) years and is a resident citizen of the State of New York.

17.   Defendant PEPSICO, is a parent company of Defendant, Bottling Group, LLC and Defendant, Bottling Group LLC dba Pepsi Beverages Company, and was an employer doing business in Erie County, New York at all times relevant to this action.

18.   Defendant, Bottling Group, LLC and Defendant, Bottling Group LLC dba Pepsi Beverages Company herein after ("PBC") was an employer doing business in Erie County, New York, by and through their subsidiary PepsiCo Beverage Sales, LLC. At all times relevant to this action Defendant was the former employer and is the employer of the Plaintiffs within the meaning of 42 U.S.C. §1981 and of 42 U.S.C. § 2000e(a) and (b).

19.   Defendant, PepsiCo Beverage Sales, LLC, hereinafter ("PBS") is an employer doing business in Erie County, New York, and is a subsidiary of PepsiCo, Inc. At all times relevant to this action, the Defendant was the former employer and is the employer of the Plaintiffs within the meaning of 42 U.S.C. §1981 and of 42 U.S.C. § 2000e(a) and (b). All DEFENDANTS hereinafter referred to as ("PEPSICO")

20.   Defendant Supervisor Ryan Meller was a managing agent, supervisor and an employer of Plaintiffs at all times relevant to this action.

21.   Defendant Supervisor Zach Rueger was a managing agent, supervisor and an employer of Plaintiffs at all times relevant to this action.

22.   Defendant Supervisor Aaron Heltz was a managing agent, supervisor and an employer of Plaintiffs at all times relevant to this action.

23.   Defendant Supervisor Paul Hudson was a managing agent, supervisor and an employer of Plaintiffs at all times relevant to this action.

24. At all times relevant to this action, the Plaintiffs were employees of PEPSICO and were rightfully attempting to make and enforce the terms of contract(s) regarding their employment. At all times relevant to this action, PEPSICO has employed at least fifteen (15) or more employees.

### IV. EXHAUSTION OF ADMINISTRATIVE PREREQUISITES

25. All Plaintiffs pursue claims against the Defendant under both Title VII and 42 U.S.C. §1981, and for New York State Law Claims. Each Plaintiff has met all administrative conditions precedent for the filing of this case under Title VII. These Plaintiffs timely filed a charge of discrimination with the EEOC and New York and each has either obtained a Right-To-Sue Notice or is awaiting receipt of their Right-To-Sue Notice. These Plaintiffs have timely brought this action following the issuance of his and/or her Right-To-Sue Notice.

26. The NEW YORK STATE DIVISION OF HUMAN RIGHTS issued the following "DETERMINATION AFTER INVESTIGATION" of Plaintiffs' claims:

**Federal Charge No. 16GC202177 -- MR. MITCHELL-**

27. On March 31, 2022, Cantrell Mitchell filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondents with an unlawful discriminatory practice relating to employment because of race/color, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law"). **After investigation, the Division has determined that it has jurisdiction in this matter**

**and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."** [Emphasis added.]

<u>**Federal Charge No. 16G202201694 -- MR. DAVENPORT-**</u>

28.     On February 11, 2022, Dante Davenport filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondents with an unlawful discriminatory practice relating to employment because of race/color, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law"). **After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."** [Emphasis added.]

<u>**Federal Charge No. 16G202200719 -- MR. HESTER-**</u>

29.     On February 7, 2022, Adrian Hester filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an unlawful discriminatory practice relating to employment because of race/color, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law"). **After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."** [Emphasis added.]

<u>**Federal Charge No. 16G202200716 -- MR. MCCARLEY-**</u>

30.     On February 11, 2022, David McCarley filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an unlawful discriminatory practice relating to employment because of race/color, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

**After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."** [Emphasis added.]

### Federal Charge No. 16GC202796-- MR. PITTMAN-

31.     On May 12, 2022, Anthony Pittman filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an unlawful discriminatory practice relating to employment because of race/color, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law"). **After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."** [Emphasis added.]

### Federal Charge No. 16GC201681 -- MR. TIL-

32.     On February 11, 2022, Robin Til filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an unlawful discriminatory practice relating to employment because of race/color, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law"). **After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."** [Emphasis added.]

### Federal Charge No. 16GC201568 -- MR. WILSON-

33.     On February 8, 2022, Malcolm Wilson filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an

unlawful discriminatory practice relating to employment because of race/color, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law"). **After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of."** [Emphasis added.]

## V. STATEMENT OF FACTS

34. Plaintiffs at all relevant times were employees of DEFENDANT PEPSICO.

35. PBC is DEFENDANT PEPSICO's beverage manufacturing, sales and distribution operating unit in the United States, Canada and Mexico. PBC makes, sells and delivers approximately 75% of PepsiCo's North American beverage volume. Its diverse portfolio includes some of the world's most widely recognized beverage brands, including Pepsi, Mountain Dew, Sierra Mist, Aquafina, Gatorade, SoBe, Lipton, and Amp Energy. In many markets, PBC also manufactures and/or distributes allied brands, including Dr. Pepper, Crush, ROCKSTAR, and Muscle Milk.

## CANTRELL MITCHELL

36. On or about September of 2021 Supervisor Ryan Meller and warehouse worker Dylan Monnin started telling Black employees that they were not allowed to eat at their tables, be in their conversations and have certain days off that White employees would receive.

37. Supervisor Ryan Meller would make racist remarks in front of Cantrell Mitchell, for example, "we are ordering pizza today, but not for Black guys."

38. As a result of this ongoing racist rhetoric, multiple Plaintiffs made formal complaints to H.R.

39.     As a result, management held a meeting to discuss these complaints. All the management is White and Black employees feel there is no one who they can go to for protection from racist supervisors and coworkers.

40.     At this meeting Paul Hudson and his team made everything out to be the Plaintiffs' fault by blaming the Black employees for racism. Saying things like, their music is racist and downplaying the racism they were complaining about.

41.     On October 31, 2021, Ryan Meller came up behind Mr. Mitchell and said "pick it up." Cantrell said, "what are you talking about." Then Ryan said, "pick up your dick because it's dragging on the ground, so throw it over your shoulder." Mr. Mitchell was stunned to hear what he thought was both sexual and racial harassment.

42.     Mr. Mitchell had finally had it with the racist and sexist environment at Pepsi so he started trying to make his own complaint. Everywhere he turned they sent him to a different place to make a complaint. He went to management, he went H.R., they sent him to the Union. The Union ran him around for days and there was an excuse for why he couldn't make a complaint every day. Finally, after many days, Cantrell threatened to quit his job, so Supervisor Aaron Heltz agreed to take his complaint and Cantrell gave him a statement.

43.     Supervisor Aaron Heltz then proceeded to misrepresent Cantrell's complaints in a way that were biased towards Pepsi. Cantrell had to make Aaron rewrite it. This was in November of 2021.

44.     As a result of Mr. Mitchell making these complaints, he was targeted by management. Cantrell started getting written up and threatened with being fired because of the writeups. The Union refused to help him in any real way and basically sided with Pepsi.

45.    Black employees at Pepsi were required to work harder than the White employees, who were assisted by management and received easier jobs, work-loads and reviews on their work.

46.    Due to coming forward with his complaints, life became miserable at Pepsi for Cantrell and due to excessive retaliation and discipline Cantrell was ultimately fired.

## DANTE DAVENPORT

47.    On or about September of 2021 the White employees, specifically Dylan Monnin,  told Black employees that they were not welcome to eat or talk with the White employees. When confronted, he told Mr. Davenport that he was only repeating what Supervisor Ryan Meller was saying to him and the other White workers.

48.    When Dante complained about this disturbing and racist rhetoric, Pepsi set up a meeting to discuss it, but the Black employees were basically interrogated by Supervisor Paul Hudson and made to feel like they were at fault and laughed off.

49.    Since that time the work environment had become hostile and Dante, along with a number of other Black employees, being very upset and unhappy with how things were at Pepsi, made formal complaints.

50.    Because Black employees are not being promoted at Pepsi, when the Plaintiffs would complain about racism, they had nobody to talk to and were ignored by their White supervisors.

51.    Dante was subjected to the constant derogatory statement "dick dragging" and other sexual language used by Supervisor Ryan Meller.

52.   When Dante requested a promotion, he was told by his supervisor that he was unable to be trusted and therefore he could not be promoted. To Dante, this was a racist comment because he is Black, so therefore, he can't be trusted.

In meetings, Supervisor Paul Hudson, turned the tables on the Black employees and stated things like playing music that Black people enjoy is "racist to White employees."

53.   Due to Dante's complaints he became targeted by management and he was disciplined for every little thing and ultimately fired.

**ADRIAN HESTER**

54.   Throughout the years of 2020 and 2021 Supervisor Ryan Meller and warehouse worker Dylan Monnin began telling Black employees that they could not sit at the lunch tables with White employees because their tables were for White people only. This also occurred when these supervisors would tell Black employees that they were not welcome in conversations with White employees because it was a "White only conversation."

55.   Several Black employees came forward and made complaints about this hostile work environment but, they were told that it was not serious enough to take action and the behavior has continued.

56.   Supervisor Ryan Meller would constantly use the derogatory terms like "dick-dragging" and it was offensive to Adrian and viewed as sexual harassment. Mr. Hester complained about this use of language and it was ignored. Mr. Hester was told by management to "grow the fuck up."

57.   Supervisor Paul Hudson laughed off Adrian's complaints of racism and said that if the Black employees didn't like his decision not to fire anyone responsible for the racially hostile environment, then "Pepsi has care-packages" for them.

58. Mr. Hester complained to H.R. about the out-of-control racism and as a result of his complaints, he was fired.

59. Due to a failure of the time keeping software, Adrian was told to only submit the days he worked and not his actual hours. Then, after he made his initial complaint with the NYSDHR, he was told by management that because he came in late on different occasions, he was stealing time from Pepsi. Adrian was told to only submit his days so they could average his time.

60. Adrian was suspended on January 7, 2022 and at that time he was relentlessly quizzed concerning his initial complaint to the NYSDHR.

61. Around that time, employees were working double shifts nearly every day and Adrian asked for certain days off, he was either told yes and then took them off, or he was told no at the last second and management used this, along with the claim that he stole time, as a pretext to fire Mr. Hester.

62. Mr. Hester was ultimately fired on January 11, 2022.

## **DAVID MCCARLEY**

63. On or about September of 2021 Dylan Monnin started repeating the language being used by Supervisor Ryan Meller, telling Black employees that they were not allowed at "White only" lunch tables and to be a part of "White only" conversations. This was extremely hurtful to Mr. McCarley and he complained to management about it.

64. Mr. McCarley went to H.R. online and he spoke to his Supervisors Randy Diemyer, Zach Rueger, Aaron Heltz and Paul Hudson. They called a meeting and Paul Hudson pulled Mr. McCarley to the side and asked "what's your problem." He started quizzing David and said "your being crazy and inciting the workers."

65.   Mr. Hudson gave a bunch of examples of how the behavior of Black employees is seen as racist to the White workers and the more he spoke the more offensive he became.

66.   Mr. McCarley was subjected to the continual use of the words "dick dragging" by Supervisor Ryan Meller.

67.   There are no people of color in management in the warehouse and Mr. McCarley personally applied for a management position and was turned down. When he asked why Ryan was not disciplined for creating the racist and segregated environment, he was told Pepsi did not want to be sued for wrongful termination. Supervisors Randy Diemyer and Aaron Heltz both said this and they said that Pepsi would rather have a lawsuit from the Black employees instead of from Ryan Meller. They confirmed to Mr. McCarley that this was told to them by upper management.

## ANTHONY PITTMAN

68.   During the first month of being hired at Pepsi, Mr. Pittman was told by Supervisor Ryan Meller that "Black guys have stay another hour" and "only White guys get to go home early." Anthony was also told by Ryan "Black guys don't get breaks and White guys get breaks."

69.   When walking by a group of White employees, Dylan Monnin told Anthony that "this is a White people only conversation and no Black guys are allowed." Dylan later apologized to Mr. Pittman and told him that he was only repeating what he heard Supervisor Ryan Meller say.

70.   After a number of other African American employees began making complaints about the racism at Pepsi, Pepsi started using Anthony's name to justify why they had not sufficiently punished Ryan Meller or handled these complaints properly. Pepsi used Anthony's name

in their responses to complaints made to the NYSDHR and made up lies stating things like Anthony exposed to management a Black conspiracy to have Ryan fired and that he was unoffended by the jokes made by Ryan. These statements by Pepsi are very offensive and demonstrate Pepsi's willingness to use Black employees to coverup their failures concerning racism in their facility.

71. Pepsi held a meeting to address the racism and Dylan Monnin was not required to attend. At this meeting Paul Hudson basically blamed the Black employees for racism because of another Latino/Black employee's music.

72. Pepsi stated that Mr. Pittman uncovered a plot by the Black employees to use their racism complaints to have Ryan Meller fired.

73. Supervisor Ryan Meller attempted to coach Mr. Pittman on how to respond to the NYSDHR investigation and made him say some of the things he said and that are not true.

74. Mr. Pittman was deeply offended by the way Supervisor Ryan Meller and Dylan Monnin were using segregation as a joke and he understands why other Black employees are hurt over it as well. Ryan has a history of being racist that pre-dates this incident. Mr. Pittman was told that he used to be referred to as the "White guy" and another Black employee used to be referred to as the "Black guy." This type of stereotyping has gone on at Pepsi for a long time.

75. Ryan Meller confessed to Anthony that he was the one who started this "White's only" stuff at work and that Dylan Monnin was copying him.

76. Mr. Pittman does not like how Pepsi has been manipulating him and using him to justify how they have mishandled these racism issues. It has created a deep amount of anxiety for Anthony and his family and he has to take anxiety medication to cope with this.

77.    Mr. Pittman considers what Pepsi is doing to be another form of racism because it is a way for them to hurt another Black man while avoiding responsibility for their mishandling of the situation which shows how much Pepsi devalues African Americans.

78.    Mr. Pittman watched Pepsi fire Adrien Hester and Cantrell Mitchell for speaking out about this racism and he expected Pepsi would retaliate against him once he came forward and defended himself.

79.    Mr. Pittman has witnessed White supervisors giving another Black employee special privileges for standing in their corner over this racism issue. Mr. Pittman was that Black guy who was being used and now they have found a new Black guy to butter up so they can have a Black ally to defend themselves against racism.

80.    On May 12, 2022 Anthony filed a complaint with the NYSDHR for discrimination. Since that date he has been subjected to retaliation by Pepsi and their supervisors.

Mr. Pittman was afraid to come forward with his initial complaint because he knew something like this would happen. Since the date Anthony filed his complaint, Ryan Meller constantly harassed him. Ryan would print out Anthony's schedule ahead of time and he would criticize everything he did and he would constantly accuse Anthony of stealing time. If Anthony made a mistake and went back to fix it, Ryan would accuse him of stealing time. Mr. Pittman was written up for taking a final break just before he went home and it is something he has seen another White worker's do and not be written up.

81.    Another employee was in need of transportation to and from work and Anthony kindly volunteered. This went on for approximately five months until one day they got pulled over while driving and this individual became very belligerent with the police, resulting in him getting a ticket, although Anthony was driving and did not receive a ticket. Mr. Pittman

told Ryan and Zach about the incident and it immediately got back to the other employee. The other employee became angry and came to work and told people at work he was going to fight Anthony. He then purposely hit Anthony with his power-jack machine then he started screaming at Anthony and they got into an argument. Anthony told his supervisor the other employee threatened to stab him and they were both sent home. Mr. Pittman was then suddenly fired for supposedly anti-gay discrimination. Mr. Pittman was shocked by this accusation because the employees' sexuality was never brought up or anything said about this. It was  obvious retaliation against Anthony for filing his complaint with the NYSDHR. Since Mr. Pittman's firing, Supervisor Ryan Meller has been publicly bragging about how he fired Anthony for arguing with a gay guy.

## ROBIN TIL

82.     Around mid-September of 2021 White Supervisors and employees at Pepsi in Buffalo started telling Black employees that they were not allowed to eat at "White tables" or participate in "White conversations." This language was used by Dylan Monnin, but he verified he was only repeating this language that was being used by Supervisor Ryan Meller.

83.     When the Black employees complained they held a couple meetings where Supervisor Paul Hudson turned things around on the Black employees and mocked their complaints. He went down the line and tried to justify the racism Black employees  were experiencing. He kept using examples of behavior he claimed Black employees were using to say that they were racist against White employees. For example, he stated that if someone used the N-word they could get fired, but if someone said "Whites only" it was not serious enough to get fired. He gave very strange analogies about racism, for example, if someone stole one

drink from Pepsi and someone else stole a case, they shouldn't be punished the same. When Mr. Til pointed out that theft is theft and racism is racism, Paul Hudson laughed at him.

84. There are no African Americans in leadership in the warehouse and Black employees are unable to get promoted.

85. Mr. Til hearing Supervisor Ryan Meller's continual use of the term "dick-dragging" to refer to working too slow, became uneasy with what he understood as a sexist and racist reference to the male genitals of African Americans, made a formal complaint.

86. Once Mr. Til came forward with other Black employees and made a complaint, Pepsi began retaliating against him and finding ways to start papering up his disciplinary file so he could be fired.

87. Mr. Til was aware of other employees who have fallen below production levels and have not been disciplined the same as himself. For example, Mr. Pittman, who Pepsi was using to justify workplace racism, fell below production standards in the same timeframe as Mr. Til, but was not written up like he was. Now that Mr. Pittman has come forward the same way as other Black employees, he has been fired.

88. Pepsi changes the rules to accommodate their retaliation because prior to Mr. Til being written up the rule was that it had to be two weeks of falling below production, but when he had one week of low production, they disciplined him because he joined into this complaint with his other Black coworkers.

## MALCOLM WILSON

89. On or about the summer of 2021 Mr. Wilson was told by Dylan Monnin, in front of his other White co-workers, that he was not welcome to sit at their table and eat lunch because It was a "White's table only."

90.    After that, Malcolm was told by another African American coworker that he was told he was unwelcome in a "White's only conversation.

91.    When Dylan was confronted by Dave Mccarley (another African American coworker) Dylan stated he was only repeating the language he heard from Supervisor Ryan Meller.

92.    Mr. Wilson reported these incidents to H.R. and nothing was done. A meeting was scheduled to talk about it, but the Black employees were laughed off by Paul Hudson . He tried to tell the African American workers that the racism and segregation that they were experiencing was not serious and made very offensive analogies concerning racism.

93.    Ultimately, it is believed Dylan was suspended for three days, but the atmosphere of racism and segregation still exists and Pepsi has become a hostile place for African Americans to work.

94.    To Mr. Wilson's understanding there are no African Americans in positions of management in the warehouse.

95.    A White co-worker named Matt came forward and told Malcolm that there is a pervasive culture of racism in management at the Buffalo Pepsi facility.

**FEDERAL CLAIMS**

**COUNT I**
**TITLE VII VIOLATIONS**
**RACE DISCRIMINATION, HARASSMENT, RETALIATION AND HOSTILE WORK ENVIRONMENT**
**AS TO ALL PLAINTIFFS**

96.    The Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs above with the same force and effect as if fully set out in specific detail hereinafter.

97.     DEFENDANTS, and each of them, have engaged in an illegal employment practice including, but not limited to, discrimination, creating a hostile work environment,

retaliation, and denying Plaintiffs the federally guaranteed right to enter into contracts because of their race in the same manner as White people.

98.    DEFENDANTS, and each of them, have discriminated against Plaintiffs in the terms, conditions and privileges of their employment through the creation and toleration of a racially charged and hostile work environment.

99.    DEFENDANTS, and each of them, have authorized, ratified, encouraged and condoned illegal employment practices, including but not limited to, a racially hostile work environment, racial slurs, racial jokes, racial harassment, racial stereotypes, and other disparate treatment by which African American persons are treated as inferior to European Americans. The racially hostile environment changed, and continues to change, the terms and conditions of the employment of the Plaintiffs.

100.    DEFENDANTS, and each of them, including supervisors and management officials, participated in, were aware of, encouraged, and condoned the racially hostile work environment.

101.    DEFENDANTS, and each of them, failed to train their employees, including the named Plaintiffs on its purported anti-discrimination policy and reporting procedures.

102.    DEFENDANTS, and each of them, failed to disseminate any anti-discrimination policies and reporting procedures after the Plaintiffs filed their complaints with Human Resources and the Equal Employment Opportunity Commission ("EEOC"). DEFENDANTS, and each of them, failed to conduct proper investigations, provide effective remedies or take appropriate corrective action to eliminate discrimination, retaliation, hostile work environment and all forms of disparate treatment in DEFENDANTS' work environment.

103.   DEFENDANTS, and each of them, through their agents and employees, have allowed European American employees to openly display racial animus against African American employees, including all of the named Plaintiffs.

104.   DEFENDANTS, and each of them, engaged in a pattern and practice of systemic discrimination, and hostile work environment that was pervasive and severe, adversely affecting Plaintiffs' terms and conditions of employment by promoting and reinforcing racial stereotypes and racial bias in the workplace.

105.   DEFENDANTS, and each of them, rejected each of the Plaintiffs repeated good faith complaints in opposition to the racial discrimination and racial harassment to which the Plaintiffs, and other African American employees, were subjected.

106.   DEFENDANTS, and each of them, retaliated against Plaintiffs because of Plaintiffs' engaging in protected activities of opposing racial discrimination and harassment.

107.   DEFENDANTS, and each of them, engaged in unlawful actions constituting a practice, pattern, custom and policy of allowing acts of racial harassment, racial discrimination and retaliation in violation of its employees' state and federally protected rights.

108.   DEFENDANTS, and each of them, failed to take any prompt and effective action reasonably calculated to result in the prevention of and remedy of the racial harassment, racial discrimination and retaliation of the named Plaintiffs. The actions of DEFENDANTS, as set out herein, violate Title VII, 42 USC 1981, and all state discrimination laws.

109.   DEFENDANTS, and each of them, have caused plaintiffs to suffer damages as follows: A. Economic loss, including lost wages, lost benefits, pharmacy bills, medical bills, and other economic loss can be quantified when ascertained. B. Non-economic loss, including,

but not limited to, pain, anxiety, inconvenience, mental distress, emotional distress, loss of enjoyment of life, humiliation, fear, discomfort, damage to health image, damage to career, suffering and misery. C. Punitive damages. D. Attorney fees and costs.

110.    DEFENDANTS, and each of them, engaged in conduct that was despicable, malicious, fraudulent, oppressive, vile, and intentionally calculated to harm and injure Plaintiffs by displaying a conscious disregard to Plaintiffs' safety, health, and constitutional rights. DEFENDANTS illegal conduct entitles Plaintiffs to punitive damages hereinafter set forth. Wherefore, Plaintiffs prays judgment hereinafter set forth.

### COUNT II
### 42 U.S.C. § 1981 VIOLATIONS
### RACIAL HARASSMENT, DISCRIMINATION & RETALIATION
### AS TO ALL PLAINTIFFS

111.    The Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs above with the same force and effect as if fully set out in specific detail hereinafter.

112.    DEFENDANTS, and each of them, denied Plaintiffs the right to contract the same as White people because of their race. DEFENDANTS, and each of them, retaliated and discriminated against Plaintiffs, denying Plaintiffs the terms, conditions and privileges of their employment through the creation and toleration of a racially charged and hostile work environment. This racially hostile environment includes, but is not limited to, racial slurs, racial jokes, racial harassment, racial stereotypes, and other disparate treatment by which African American persons are treated as inferior, as set out in detail above and below.

113.    DEFENDANTS, and each of them, through their agents and employees, denied Plaintiffs' right to contract, including any European American employees who come forward to report

racism, the same as White people by maintaining an intolerable hostile work environment fueled by racial animus against African Americans,

114.    As set out in detail above, in retaliation for the Plaintiffs' good faith opposition to racial harassment and racial discrimination, the DEFENDANTS have retaliated against the Plaintiffs and other African American employees who have protested and complained about the racially discriminatory treatment. The DEFENDANTS' conduct was retaliation based, at least in part, on the Plaintiffs' protected activities of opposing racial discrimination and harassment. The unlawful actions of the DEFENDANTS, as set forth above, constitute a practice, pattern, custom and policy of the DEFENDANTS for allowing acts of racial harassment, racial discrimination and retaliation in violation of their employees' state and federally protected rights.

115.    Mr. Cantrell Mitchell was hired by DEFENDANTS on or about August 26, 2021 as a Warehouse Worker and was terminated by DEFENDANTS on or about January 12, 2022.

116.    Mr. Dante Davenport was hired by DEFENDANTS on or about November of 2019 as a Warehouse Worker and was terminated by the DEFENDANTS on or about May of 2022.

117.    Mr. Adrian Hester was hired by DEFENDANTS on or about June 7, 2018 as a Warehouse Worker and was terminated by DEFENDANTS on or about January 7, 2022.

118.    Mr. David McCarley was hired by DEFENDANTS on or about November 11, 2014 as a Warehouse Worker and remains employed by the DEFENDANTS.

119.    Mr. Anthony Pittman was hired by DEFENDANTS on or about February 2, 2021 as a Warehouse Worker and was terminated by DEFENDANTS on or about January 9, 2023.

120.    Mr. Robin Til was hired by DEFENDANTS on or about August of 2019 as a Warehouse Worker and remains employed by the DEFENDANTS.

121.  Mr. Malcolm Wilson was hired by DEFENDANTS on or about MARCH 15, 2021 as a Warehouse Worker and remains employed by the DEFENDANTS.

122.  Plaintiffs have been treated less favorably than European American employees in the terms and conditions of their employment and employment rules and policies are applied differently to the Plaintiffs than their European American counterparts.

123.  During the course of their employment, the Plaintiffs were denied proper training and have been given unwarranted counseling based on their African American race.

124.  As a direct result of being denied training, Plaintiffs have also been denied promotional opportunities.

125.  Throughout Plaintiff's employment, in their department DEFENDANTS hired no African American Supervisors and all of the upper management are European American.

126.  DEFENDANTS do not post vacancy announcements for the positions of Supervisor or Lead Person. DEFENDANTS have a practice and a custom of merely selecting less qualified European American employees for these positions with no posting or application process. This custom and practice by DEFENDANTS deny African American employees the opportunities for promotions.

127.  Plaintiffs were given lower evaluations than similarly situated European American employees, resulting in lower wage increases than the European American employees, as pay increases are allegedly tied to employment evaluations.

128.  The lower evaluations given to the African American employees, including Plaintiffs, results in receiving lower pay increases and hourly rates than less qualified European American employees.

129.   Plaintiffs have been denied promotions and training for positions which would have afforded them greater pay and prestige.

130.   Due to ongoing and an extremely racist work environment directed at Plaintiffs and other African American employees, Plaintiffs complained about the racially discriminatory and hostile conduct, but no remedial actions have been taken by DEFENDANTS to stop and prevent such conduct. In-fact, the DEFENDANTS continued to employ the primary offenders and then subjected these Plaintiffs to hostility, animus, discipline, lack of training, and lack of promotions.

131.   The racially discriminatory and hostile conduct is on-going and of a continuing nature, and it creates a racially hostile environment in which African Americans are forced to work.

132.   Plaintiffs have been subjected to racial epithets and racial comments being made by European American workers. The epithets and comments include, but are not limited to, the following: tables are for "Whites only,"  conversations are for "Whites only," pizza is for "Whites only," breaks are for "Whites only," among countless others.

133.   These racially derogatory comments and slurs are severe and pervasive and have changed the terms and conditions of Plaintiffs' employment and all of the Plaintiffs were subjected to such racially derogatory comments and slurs.

134.   Plaintiffs complained about the above racially hostile conduct to Human Resources, but no action was taken by the DEFENDANTS to stop and prevent this improper conduct from recurring and it has continued.

135.   After complaining about the racially discriminatory conduct and hostile environment, Plaintiffs have been retaliated against in the terms, and conditions of their employment.

136.    Plaintiffs Cantrell Mitchell, Dante Davenport, Adrian Hester and Anthony Pittman have been terminated and Plaintiffs David McCarley, Robin Til, and Malcolm Wilson are still subjected to a racially hostile work environment and are still discriminatorily prevented from attempting to advance within the company and are

137.    DEFENDANTS, and each of them, have caused plaintiffs to suffer damages as follows: A. Economic loss, including lost wages, lost benefits, pharmacy bills, medical bills, and other economic loss can be quantified when ascertained. B. Non-economic loss, including, but not limited to, pain, anxiety, inconvenience, mental distress, emotional distress, loss of enjoyment of life, humiliation, fear, discomfort, damage to health image, damage to career, suffering and misery. C. Punitive damages. D. Attorney fees and costs.

138.    DEFENDANTS, and each of them, engaged in conduct that was despicable, malicious, fraudulent, oppressive, vile, and intentionally calculated to harm and injure Plaintiffs by displaying a conscious disregard to Plaintiffs' safety, health, and constitutional rights. DEFENDANTS illegal conduct entitles Plaintiffs to punitive damages hereinafter set forth. Wherefore, Plaintiffs pray judgment hereinafter set forth.

## STATE CLAIMS

### COUNT III
### N.Y.S. EXC. LAW § 296 VIOLATIONS – DISCRIMINATION, HARASSMENT AND HOSTILE WORK ENVIRONMENT AS TO ALL PLAINTIFFS

139.    The Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs above with the same force and effect as if fully set out in specific detail hereinafter.

140.    N.Y.S. Exc. Law § 296 (1)(h) states in part:

1. It shall be an unlawful discriminatory practice:

(h) For an employer, licensing agency, employment agency or labor organization to subject any individual to harassment because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, domestic violence victim status, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories.

141.   DEFENDANTS, and each of them, caused Plaintiffs to suffer the indignities of blatant and extreme racism every day while employed by the DEFENDANTS.

142.   DEFENDANTS, and each of them, forced all Plaintiffs to endure racial epithets and slurs directed toward Plaintiffs  and other African American employees on a daily basis.

143.  As a result of the severe conditions of racism allowed to flourish in the workplace, in the Summer of 2021, Plaintiffs were forced to report these conditions to Human Resources.

144.   Nearly immediately after reporting this racist and toxic environment to Human Resources, all of the Plaintiffs were then subject to retaliation.

145.   The retaliation suffered by the Plaintiffs includes, but is not limited to, failure to train, refusal to promote, isolation and ridicule of the Plaintiffs by management and co-workers,

purposely being put into scenarios where Plaintiffs would fail, extreme scrutiny and discipline meant to intimidate the Plaintiffs, among other harassment.

146.    DEFENDANTS, and each of them, have caused Plaintiffs to suffer damages as follows: A. Economic loss, including lost wages, lost benefits, pharmacy bills, medical bills, and other economic loss can be quantified when ascertained. B. Non-economic loss, including, but not limited to, pain, anxiety, inconvenience, mental distress, emotional distress, loss of enjoyment of life, humiliation, fear, discomfort, damage to health image, damage to career, loss of prestige, mental anguish, emotional pain, suffering and misery. C. Punitive damages. D. Attorney fees and costs.

147.    DEFENDANTS, and each of them, engaged in conduct that was despicable, malicious, fraudulent, oppressive, vile, and intentionally calculated to harm and injure Plaintiffs by displaying a conscious disregard to Plaintiffs' safety, health, and constitutional rights. DEFENDANTS illegal conduct entitles Plaintiffs to punitive damages hereinafter set forth. Wherefore, Plaintiffs pray judgment hereinafter set forth.

## COUNT IV
## N.Y.S. EXC. LAW § 296 VIOLATIONS – WRONGFUL TERMINATION
## AS TO PLAINTIFFS CANTRELL MITCHELL, DANTE DAVENPORT, ADRIAN HESTER and ANTHONY PITTMAN

148.    The Plaintiff realloge and incorporate by reference each of the foregoing paragraphs above with the same force and effect as if fully set out in specific detail hereinafter.

149.    N.Y.S. Exc. Law § 296 (1)(a) states:

It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of an individual's age, race,

creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

150.    Plaintiffs were subjected to daily infliction of racial terror while employed by the DEFENDANTS. They were forced to endure racial epithets, racial slurs, racial innuendoes, racial jokes, racial accusations, and further discrimination.

151.    In response to the reporting of this outrageous behavior to Human Resources, Plaintiffs were almost immediately, were subjected to intense scrutiny and discipline.

152.    Plaintiffs found themselves being written up for infractions on nearly a daily basis and ridiculed by management to the point they were emotionally unable to perform their jobs.

153.    Plaintiffs suffering came to an abrupt employment end on or about when they were notified that they were terminated.

154.    By reason of DEFENDANTS' discriminatory employment practices including wrongful termination, Plaintiffs have experienced harm, including loss of compensation, back and front pay, and other employment benefits, and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

155.    DEFENDANTS, and each of them, have caused Plaintiffs to suffer damages as follows: A. Economic loss, including lost wages, lost benefits, pharmacy bills, medical bills, and other economic loss can be quantified when ascertained. B. Non-economic loss, including, but

not limited to, pain, anxiety, inconvenience, mental distress, emotional distress, loss of enjoyment of life, humiliation, fear, discomfort, damage to health image, damage to career, suffering and misery. C. Punitive damages. D. Attorney fees and costs.

156.   DEFENDANTS, and each of them, engaged in conduct that was despicable, malicious, fraudulent, oppressive, vile, and intentionally calculated to harm and injure Plaintiffs by displaying a conscious disregard to Plaintiffs' safety, health, and constitutional rights. DEFENDANTS' illegal conduct entitles Plaintiffs to punitive damages hereinafter set forth.

Wherefore, Plaintiff prays judgment hereinafter set forth.

**COUNT V**
**Negligent Hiring, Training, Retention, and Supervision**
**Against All Defendants**

157.   The Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs above with the same force and effect as if fully set out in specific detail hereinafter.

158.   Plaintiffs allege claims for Negligent Hiring, Training, Retention, and Supervision. To prevail in any such claims, a Plaintiff must prove, in addition to the elements of standard negligence, that "(1) the tort-feasor and the defendant were in an employee-employer relationship, (2) the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (internal citations and quotation marks omitted).*

**"Association Discrimination"**

159.    DEFENDANTS, and each of them, owed Plaintiffs a duty of care to be free from discrimination, harassment and hostile work environment. The evidence adduced above and law, demonstrate DEFENDANT owed a duty *specifically* to Plaintiffs and to African Americans and other protected classifications, "a targeted group of individuals within a population." Defendants' European American harassing racist employees discriminated against Plaintiffs because of Plaintiffs African American "Race." Defendants' European American harassing racist employees only used such racist language against the Plaintiffs because those White employees felt comfortable in their presumption that Defendants European American management would acquiesce and participate in the racist name calling and hostile work environment. Therefore, Defendants' European American harassing racist employees' conduct in creating a race based hostile working environment was motivated by the "Race" of Plaintiffs. Although Dylan Monnin was suspended for three days, Defendants took no action against other racist employees. The "Race" discrimination against Plaintiffs and other African Americans violates Title VII and New York's State law prohibiting discrimination in the work place based on protected classifications, *inter alia*, as race.

160.    DEFENDANTS breached the statutory duty imposed by Title VII and the anti-discrimination laws of the State of New York by failing to protect Plaintiffs from discrimination, harassment, hostile work environment and retaliation.

161.    DEFENDANTS, and each of them, failed to hire employees who respected the laws of America and the State of New York, prohibiting racial discrimination and all forms of discrimination on the basis of protected classifications. The employees who subjected Plaintiffs to perpetual racism were racist at the time of hire. Even after DEFENDANTS

received repeated reports of racist conduct exhibited by employees, DEFENDANTS failed to discipline or train these employees. DEFENDANTS had actual and constructive knowledge of the discrimination occurring in its work force. DEFENDANTS knew or should have known of the European American employee's propensity for the racist conduct because such conduct was reported to DEFENDANTS. The illegal discrimination, hostile work environment, harassment and retaliation occurred on DEFENDANTS' premises. Hence, DEFENDANTS are liable to Plaintiffs for all of their injuries, damages and harm.

162.  By reason of DEFENDANTS' discriminatory employment practices including wrongful termination, the named Plaintiffs have experienced harm, including loss of compensation, back and front pay, and other employment benefits, and continues to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

163.  DEFENDANTS, and each of them, have caused Plaintiffs to suffer damages as follows: A. Economic loss, including lost wages, lost benefits, pharmacy bills, medical bills, and other economic loss can be quantified when ascertained. B. Non-economic loss, including, but not limited to, pain, anxiety, inconvenience, mental distress, emotional distress, loss of enjoyment of life, humiliation, fear, discomfort, damage to health image, damage to career, suffering and misery. C. Punitive damages. D. Attorney fees and costs.

164.  DEFENDANTS, and each of them, engaged in conduct that was despicable, malicious, fraudulent, oppressive, vile, and intentionally calculated to harm and injure Plaintiffs by displaying a conscious disregard to Plaintiffs' safety, health, and constitutional rights. DEFENDANTS illegal conduct entitles Plaintiffs to punitive damages hereinafter set forth. Wherefore, Plaintiff prays judgment hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, the named Plaintiffs request the following relief:

1. Acceptance of jurisdiction of this cause;

2. A declaratory judgment that the DEFENDANTS' employment practices challenged herein are illegal and in violation of Title VII and 42 U.S.C. §1981;

3. A temporary and permanent injunction against DEFENDANTS and their partners, officers, owners, agents, successors, employees, representatives and any and all persons acting in concert with it, from engaging in any further unlawful practices, policies, customs, usages, racial discrimination and retaliation by such Defendant set forth herein;

4. An Order requiring DEFENDANTS to initiate and implement programs that provide (i) equal employment opportunities for African American employees; (ii) remedy the effect of Defendant's past and present unlawful employment practices;
and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described above;

5. An Order requiring DEFENDANTS to initiate and implement systems of assigning, training, transferring, compensating, and promoting African American employees in a non-discriminatory manner;

6. An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (4) and (5), above, which would provide for (i) the monitoring, reporting, and retaining of jurisdiction

to ensure equal employment opportunity, (ii) the assurance that injunctive

relief is properly implemented, and (iii) a quarterly report setting forth

information relevant to the determination of the effectiveness of the programs

described in (4) and (5), above;

7. An award of back pay; front pay; lost job benefits; preferential rights to

jobs, and other equitable relief for the named Plaintiffs;

8. An award of compensatory and punitive damages for all legal relief sought

in this complaint; including an award of punitive damages in the amount of

$33,000,000 against all Defendants to protect society from such illegal and

despicable conduct, and as exemplary damages to deter such multi-national

Defendants as PEPSICO engaging in Jim Crow culture and illegal

discriminatory behavior;

9. An award of litigation costs and expenses, including reasonable attorneys'

fees;

10. Prejudgment and post judgment interest; and

11. Such other and further relief as the Court may deem just and proper.


                                                RESPECTFULLY SUBMITTED,

Date: May 18, 2023


                                                RYDER LAW FIRM
                                                By: /s/ Jesse P. Ryder
                                                Jesse P. Ryder, Esq.
                                                Attorney for Plaintiffs
                                                RYDER LAW FIRM
                                                6739 Myers Road East
                                                Syracuse, NY 13057
                                                Tel: (315) 382-3617
                                                Fax: (315) 295-2502
                                                ryderlawfirm@gmail.com

Dated: May 18, 2023

LAW OFFICES OF BONNER & BONNER
By: */s/Charles A. Bonner*
Charles A. Bonner
California State Bar No.: 85413
Attorney for Plaintiffs
(*Pro Hac Vice Pending*)
LAW OFFICES OF BONNER & BONNER
475 GATE FIVE RD, SUITE 211
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
charles@bonnerlaw.com

Dated: May 18, 2023

LAW OFFICES OF BONNER & BONNER
By: */s/A. Cabral Bonner*
A. Cabral Bonner
California State Bar No.: 247528
Attorney for Plaintiffs
(*Pro Hac Vice Pending*)
LAW OFFICES OF BONNER & BONNER
475 GATE FIVE RD, SUITE 211
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cabral@bonnerlaw.com